**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| TOWN OF PEPPERELL, MASSACHUSETTS,<br>***Plaintiff*,**<br><br>***v.***<br><br>GEORGIA-PACIFIC, LLC;<br>WEYERHAEUSER COMPANY;<br>NEENAH, INC.;<br>AHLSTROM-MUNKSJO PAPER INC.;<br>HONEYWELL INTERNATIONAL INC.; *and*<br>HOLLINGSWORTH & VOSE COMPANY,<br><br>***Defendants*.** | **C.A. No. 1:26-cv-10965**<br><br>**CERCLA COMPLAINT**<br>**42 U.S.C. §§ 9607(a) and 9613(f)(1)** |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

COMES NOW, the Plaintiff, the Town of Pepperell, Massachusetts (hereinafter "Plaintiff" or "Pepperell"), and a Complaint against the Defendants Georgia-Pacific, LLC; Weyerhaeuser Company; Neenah, Inc.; Ahlstrom-Munksjo Paper Inc.; Honeywell International Inc.; and Hollingworth & Vose Company (hereinafter, collectively, "Defendants"), avers and states as follows:

## INTRODUCTION

1. The Town of Pepperell owns and operates a public water system supplying over 9,000 residential, commercial, and industrial customers in Pepperell, Massachusetts in Middlesex County.

2. Pepperell's drinking water system includes a water treatment plant and five gravel packed groundwater wells ("Pepperell's Water Source"). The wells are separated from each other but draw water from the same major watershed.

3. Pepperell's groundwater wells have been, and are being, contaminated by synthetic per- and polyfluoroalkyl substances ("PFAS"), including chemicals that break down into PFAS, that were purchased, consumed, transported, used, processed, mixed, stored, handled, released and/or disposed of by Defendants and/or otherwise released into the environment from Defendant's properties.

4. PFAS are considered "emerging contaminants" because they are newly recognized as posing significant risks to human health, were not routinely monitored in the past, and until very recently were not regulated.

5. PFAS have been detected in Pepperell's drinking water supply.

6. In this civil action, Pepperell seeks to recover the costs associated with the necessary response to contamination of its water supply wells with PFAS, including but not limited to the costs of removing these contaminants as a result of Defendants' tortious conduct and their release, remedial costs associated with long-term actions to address these releases, as well as investigation and information gathering costs, groundwater monitoring costs, and other related costs.

7. Pepperell further brings this action to seek, *inter alia*, available remedies under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"); to recover compensatory and all other damages and relief, including all necessary funds to compensate Pepperell for the costs of investigating, monitoring, evaluating, abating, and remediating the presence of perfluorooctanic acid (PFOA) and perfluorooctane sulfonic acid (PFOS) in its drinking water, including constructing, installing, operating, and maintaining the treatment facilities and equipment required to remove PFAS, including PFOA, and PFOS from public water supplies; as well as periodic sampling of groundwater; and for such other damages and relief the Court may order.

8. Upon information and belief, Defendants' utilized materials containing PFAS, and other substances that transform into PFAS, in their business operations, and who either tortiously or through ordinary operations used, released, stored, handled, and/or disposed of PFAS and materials containing these contaminants in such a manner that has caused PFAS to migrate into and exist in Pepperell's drinking water, thereby damaging and injuring Pepperell.

9. Defendants, as the responsible parties, and not the Town of Pepperell, its taxpayers, or its customers, should bear all past, present, and future costs of addressing the above presence and removal of PFAS from its drinking water supply.

10. Defendants are jointly and severally responsible, negligently, intentionally and/or in some actionable manner, for the events and happenings referred to herein, and caused and continue to cause injuries and damages to Pepperell, as alleged, either through Defendants' own conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

## JURISDICTION AND VENUE

11. Jurisdiction is proper in this Court under 28 U.S.C. § 1331 (civil action under the laws of the United States) and 28 U.S.C. § 2201 (declaratory relief). Jurisdiction is also proper in this Court under 42 U.S.C. § 9613(b) (the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA")). Pursuant to 28 U.S.C. § 1367(a) the Court has supplemental jurisdiction of all other claims that form part of the same case or controversy under Article III of the United States Constitution. The Town of Pepperell brings this civil suit, in part, pursuant to sections 42 U.S.C. §§ 9607(a) and 9613(g) of CERCLA.

12. This Court has personal jurisdiction over Defendants by virtue of each Defendant's regular and systematic contacts with Massachusetts, including, among other things, conducting

business and/or owning property in Massachusetts, and because they have the requisite minimum contacts with Massachusetts necessary to constitutionally permit the Court to exercise jurisdiction over them consistent with traditional notions of fair play and substantial justice.

13. Under 28 U.S.C. § 1391(b)(2), venue is proper in this Court because a substantial part of the events giving rise to the Pepperell's claims occurred in this judicial district, and a substantial part of property that is the subject of this action is situated in this judicial district.

## FACTUAL BACKGROUND

### A. PFAS and Their Risk to Public Health

14. PFAS are man-made manufactured chemical compounds containing fluorine and carbon. The carbon-fluorine bond is one of the strongest bonds in chemistry and provides PFAS their unique chemical properties.

15. These synthetic chemicals have been used for decades and found in a wide range of industrial, commercial, and consumer products and activities such as nonstick cookware, industrial waste disposal, the pharmaceutical industry, cosmetics and beauty products, mining, plastic fabrication, and landfills and transfer stations. The wide range of uses is due to their unique properties, such as their mobility, ability to reduce surface tension and use as lubricants, and resistance to heat, water, and oil. In addition, their resistance to high temperatures and chemical reactions makes them ideal for chemical processing and manufacturing. PFAS are also used in chemical manufacturing as surfactants and emulsifiers.

16. PFAS have been used in numerous applications and industries, including: packaging, paper, and cardboard; adhesives; coatings, wax, paint, varnish, and inks; plastic and

metal etching; metal plating and finishing;; plastics, resins, and rubber; recycling and material recovery; refrigerants; semiconductor industry; and textiles, among others.[1]

17. Unlike traditional water contaminants, PFAS can cause human health impacts at incredibly small concentrations. For example, drinking water contaminants like chloride, copper, and nitrate are tested and measured in milligrams per liter; one milligram per liter is equivalent to one part per million. Other drinking water contaminants like lead and sodium are measured in micrograms per liter; one microgram per liter is approximately one part per billion. PFAS are an order of magnitude smaller. PFAS are measured in nanograms per liter; one nanogram per liter is approximately equivalent to one part per *trillion* ("ppt"). To put this in perspective, 1.0 ppt is roughly the equivalent of one drop of water in 20 Olympic-size swimming pools, or 1 second in 32,000 years.

18. PFAS enter the environment, in part, from industrial and commercial facilities that make or use PFAS and/or PFAS containing products to make other products, through effluent runoff from landfills and transfer stations, and waste disposal.

19. Due to their strong chemical bond, PFAS can remain in the environment, particularly in water, for many, many years and are therefore referred to colloquially as "forever chemicals" and are resistant to degradation due to light, water, and biological processes.

20. Because of their unique properties, PFAS are mobile and persistent in the environment. PFAS readily contaminates soils and leach from soils into surface waters and groundwater, where they can travel significant distances. PFAS therefore spread easily once released into the environment.

---

[1] *See, e.g.,* Linda G. T. Gaines, PhD, PE, *Historical and current usage of per- and polyfluoroalkyl substances (PFAS): A literature review*, American Journal of Industrial Medicine, April 20022, *available at*: https://onlinelibrary.wiley.com/doi/full/10.1002/ajim.23362.

21. Once PFAS enter a water supply they spread rapidly because they are water soluble, with contaminated drinking water reaching every home and a service connection's place of business.

22. The United States Environmental Protection Agency (EPA) has found that PFAS can be released during the manufacturing process through spills, emission vectors, and runoff, and as a component of industrial wastewater and solid waste.[2]

23. PFAS can leach from solid waste directly into the environment.

24. Conventional drinking water treatment processes are ineffective at removing PFAS from the water column.

25. PFAS bioaccumulate, meaning that they tend to accumulate in organisms. PFAS bioaccumulate in numerous ways. They are relatively stable once ingested, and bind to proteins and molecules in blood, tissues, and organs rather than fat like many other persistent chemicals. These properties allow them to stay in the human body for long periods of time, and long-term exposure such as drinking PFAS contaminated water every day can cause significant accumulation even at low levels of exposure. For example, in humans PFOA and/or PFOS remain in the body for years. Thus, any newly ingested PFOA and PFOS will be added to any PFOA and PFOS already present and only increase health risks over time.

26. PFAS also biomagnify, meaning that their concentration in organic tissue increases as they are consumed up the food chain.

27. PFAS are toxic and cause significant adverse effects to human health. Human studies show associations between PFOA and PFOS levels in blood and an increased risk of several

---

[2] *See, e.g.*, EPA, *Interim Guidance on the Destruction and Disposal of Perfluoroalkyl and Polyfluoroalkyl Substances and Materials Containing Perfluoroalkyl and Polyfluoroalkyl Substances – Version 2 (2024)*, April 8, 2024, available at https://www.epa.gov/system/files/documents/2024-04/2024-interim-guidance-on-pfas-destruction-and-disposal.pdf.

health effects, including effects on the liver, the immune system, increased risk of high blood pressure, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-eclampsia (a complication of pregnancy that includes high blood pressure), and kidney and testicular cancer. In addition, PFOA is associated with high cholesterol, decreases in antibody responses to vaccines, high blood pressure and preeclampsia during pregnancy, and decreased birthweight.

28. These injuries can arise months or years after exposure to PFAS.

29. PFAS' extreme persistence in the environment and its toxicity, mobility, and bioaccumulation potential, pose significant adverse effects to human health and the environment.

30. PFOS, PFOA, perfluoroheptanoic acid (PFHpA), perfluorohexanoic acid (PFHxA), and PFHxS are among the 29 contaminants now being monitored under EPA's Fifth Unregulated Contaminant Monitoring Rule ("UCMR 5"), a rule EPA promulgated under the Safe Drinking Water Act.[3] This rule is part of a federal initiative to collect data on unregulated contaminants in public drinking water systems, and in particular "emerging contaminants." The goal is to determine the prevalence, concentration, and human health impact of these contaminants and assess whether future regulation of them is necessary to protect public health.

31. PFAS in general cause significant health impacts, such as diminished antibody responses to vaccines and reduced immune cell function leading to increased susceptibility to infections.

32. EPA has concluded that PFOS and PFOA are likely to be carcinogenic to humans, and likely to cause hepatic, immunological, cardiovascular, and developmental effects in humans.[4]

---

[3] *See* Final Rule, Revisions to the Unregulated Contaminated Monitoring Rule (UCMR 5) for Public Water Systems and Announcement of Public Meetings, 86 Fed. Reg. 73131 (Dec. 27, 2021).

[4] *See* EPA's final toxicity assessments in support of EPA's 2024 National Primary Drinking Water Regulation for PFAS, available at https://www.epa.gov/system/files/documents/2024-05/final-human-health-toxicity-assessment-pfos.pdf and https://www.epa.gov/system/files/documents/2024-05/final-human-health-toxicity-assessment-pfoa.pdf.

33. PFHpA is suspected to cause cancer, cause endocrine disruption, accelerated puberty, cause liver and immune system damage, and linked to reduced fertility and low birth rates. Chronic exposure to PFHpA, such as consuming contaminated drinking water over an extended period, poses serious health risks.

34. EPA has identified health risks associated with PFNA, especially through drinking water. These include developmental effects, immune system impacts, thyroid issues, and neurodevelopmental problems. PFNA has been used in products including cleaning and polishing products and is a breakdown of other PFAS.

35. Research indicates exposure to PFHxS has been linked to various potential health effects, including impacts on the thyroid, affecting metabolism, development, and neurological function; liver toxicity and increased incidence of liver tumors; developmental issues, such as delayed puberty and reduced birth weight; and potential kidney damage. PFHxS is particularly persistent in humans, with a half-life of 5-8 years. Chronic exposure to PFHxS, such as consuming contaminated drinking water over an extended period, poses serious health risks. PFHxS is used in water and stain coatings for consumer products like electronics and packaging. It has been used industrially as a surface protection agent for cleaning and polishing products, and other industrial fluids and water-proofing agents.

36. On October 2, 2020, the Massachusetts Department of Environmental Protection ("MassDEP") adopted the Massachusetts Maximum Contaminant Level ("MMCL") of 20 ppt for the sum of six PFAS, which is applicable to community and non-transient non-community systems, with the purpose of protecting against adverse health effects for all people consuming the water. The regulated six PFAS, which are collectively called "PFAS6," are PFOS, PFOA, perfluorohexane sulfonic acid ("PFHxS"), perfluorononanoic acid ("PFNA"), perfluoroheptanoic acid ("PFHpA"), and perfluorodecanoic acid ("PFDA").

37. On April 10, 2024, EPA announced enforceable levels for PFOA, PFOS, and other PFAS in drinking water. EPA set maximum containment levels (MCLs) for PFOA and PFOS at 4.0 ppt (also expressed as ng/L) under the Safe Drinking Water Act.[5] On May 14, 2025, the Trump Administration announced that EPA would retain drinking water standards for PFOA and PFOS and reevaluate standards EPA had set for others.[6]

38. Effective July 9, 2024, EPA designated both PFOS and PFOA as a "hazardous substance" under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601 *et seq.,* because EPA determined that PFOS and PFOA "may present a substantial danger to the public health or welfare or the environment when released."[7] Under CERCLA, the quantity or concentration of a hazardous substance is not a factor.

## B. PFAS in the Town of Pepperell Public's Water Supply and Defendants' Connection to It

39. A safe and plentiful drinking water supply is essential to the health and welfare of Pepperell's residents and to the local economy.

40. Plaintiff, Town of Pepperell, owns and operates a public water system (MassDEP PWSID #2232000) that provides water to over 9,000 full-time residents and commercial customers through approximately 3,239 service connections.

41. The Source Water Assessment and Protection (SWAP) program is a requirement of the federal Safe Drinking Water Act that obligates every state to inventory land uses within the recharge areas of all public water supply sources, assess each source's susceptibility to

---

[5] *See* Final Rule, PFAS National Primary Drinking Water Standards, *See* 89 Fed. Reg. 32532 (April 26, 2024).

[6] *See* EPA Press Release, *EPA Announces it Will Keep Maximum Containment Levels for PFOA, PFOS* (May 14, 2025), *available at*: https://www.epa.gov/newsreleases/epa-announces-it-will-keep-maximum-contaminant-levels-pfoa-pfos.

[7] Final Rule, Designation of Perfluorooctanic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 89 Fed Reg. 39124 (May 8, 2024).

contamination from those land uses, and publicize the results to support improved protection. MassDEP's February 26, 2002 SWAP report for Pepperell explains that "susceptibility" is a measure of a supply's potential to become contaminated due to land uses and activities in its recharge area, not a finding of existing water-quality violations, and that the document is intended as a planning tool to guide local source protection, best management practices, and wellhead protection controls.[8]

42. Pepperell's public water system draws five gravel-packed wells at an average depth of sixty (60) feet. Pepperell's SWAP Report indicates that each well has a 400-foot Zone I and a mapped Zone II primary recharge area and is located in an unconfined aquifer with "high vulnerability to contamination" because of the absence of clay or other hydrogeologic barriers to contaminant migration.

43. The wells are: the Nashua Road Well #1 (Source ID 2232000-05G) located off Nashua Road and Emerson Circle ("Nashua Well No. 1"); two Jersey Street wells (#1, Source ID 2232000-02G, and #2, Source ID 2232000-03G) off Jersey Street (the "Jersey Street Wells"); and the Bemis Road wells #1 and #2 are located at the end of Bemis Road; and two Bemis Road wells (#1, MassDEP Source ID 2232000-01G, and #2, Source ID 2232000-04G) at the end of Bemis Road.

44. For the Jersey Street wells, the SWAP Report notes that their Zone II extends into the Town of Groton.

[8] Massachusetts Department of Environmental Protection, *Source Water Assessment and Protection (SWAP) Report for Town of Pepperell* (February 26, 2002), *available at* https://www.mass.gov/doc/central-region-source-water-assessment-protection-swap-program-reports-0/download.

45. Nashua Road Well No. 1 has been offline since June 2021 due to elevated levels of PFAS. All wells are located in an aquifer with high vulnerability to contamination due to the absence of hydrogeologic barriers that can prevent contaminant migration, which facilitates the infiltration and migration of PFAS contamination.

46. Water from Nashua Road Well No. 1 (currently available only during emergency conditions) and the two Jersey Street wells is directed through a staggered tray aeration tower to reduce carbon dioxide levels then potassium hydroxide is added to further adjust pH. Finished water is then treated with sodium hypochlorite for disinfection. MassDEP limits the wells to pump no more than 1.3 million gallons per day on an annual average basis. Finished water is stored in three water storage tanks with a total capacity of 3 million gallons, and two booster pump stations provide water to the high-pressure zone of the Town's distribution system.

47. Pepperell and MassDEP constantly monitor the water quality of the water system to determine whether the existing water treatment is effective and whether any additional treatment is required.

48. On October 14, 2020, Pepperell's drinking water was sampled for the presence of PFAS. Results showed detected levels of PFAS, including PFOA and PFOS, in all five wells, some above EPA's maximum contaminant levels (MCL). Sample results collected for Nashua Well No. 1 showed levels of 12.4 parts per trillion (ppt) for PFOA and 5.54 ppt for PFOS. In 2021, sampling results for Nashua Well No. 1 again showed levels exceeding Massachusetts' PFAS6 standards (20 ppt), and Pepperell consequently took Nashua Well No. 1 offline.

49. The following are some of Pepperell's PFAS results, all expressed in parts per trillion ("ppt"):

**Jersey St. Well #1**

| *DATE* | *PFOS* | *PFOA* | *PFHXS* | *PFNA* | *PFHPA* | *PFDA* | *PFAS6* | *PFBS* |
|---|---|---|---|---|---|---|---|---|
| 10/14/2020 | 5.50 | 6.27 | 1.31 | ND | 1.16 | ND | 11.77 | 1.42 |
| 5/12/2021 | 6.10 | 6.02 | 1.52 | ND | 1.19 | ND | 12.12 | 1.12 |
| 7/26/2022 | 7.35 | 8.40 | 2.21 | 0.652 | 1.81 | ND | 18 | 2.21 |
| 7/24/2023 | 6.01 | 8.75 | 1.57 | ND | 1.35 | ND | 14.8 | 1.75 |
| 8/8/2023 | 6.50 | 9.74 | 1.48 | 0.775 | 1.70 | ND | 16.2 | 1.66 |

**Jersey St. Well #2**

| *DATE* | *PFOS* | *PFOA* | *PFHXS* | *PFNA* | *PFHPA* | *PFDA* | *PFAS6* | *PFBS* |
|---|---|---|---|---|---|---|---|---|
| 10/14/2020 | 3.62 | 2.52 | 2.05 | ND | ND | ND | 8.19 | 1.79 |
| 5/12/2021 | 2.96 | 3.53 | 2.51 | ND | 0.900 | ND | 9.00 | 1.76 |
| 5/9/2022 | 7.86 | 4.85 | 5.48 | 0.898 | 1.12 | ND | 18.2 | 3.10 |
| 7/24/2023 | 5.91 | 8.18 | 2.12 | 0.612 | 1.62 | ND | 16.2 | 2.05 |

**Nashua Well No. 1**

| *DATE* | *PFOS* | *PFOA* | *PFHXS* | *PFNA* | *PFHPA* | *PFDA* | *PFAS6* | *PFBS* |
|---|---|---|---|---|---|---|---|---|
| 10/14/2020 | 5.54 | 12.4 | 1.12 | ND | 1.61 | ND | 19.06 | 2.88 |
| 4/6/2021 | 8.53 | 12.4 | 0.815 | ND | 1.26 | ND | 21.745 | 1.46 |
| 5/9/2022 | 16.3 | 21.7 | 1.49 | ND | 1.19 | ND | 38.0 | 2.61 |
| 6/6/2023 | 14.4 | 30.6 | 1.34 | ND | 2.40 | ND | 47.4 | 2.08 |

50. Since the Nashua Road well shutdown, Pepperell has had to rely completely on its other wells, which increased operational costs and reduced system capacity and redundancy.

51. PFAS6 monitoring in 2024 showed that the Jersey Street wells have a running annual average PFAS6 concentration of 16.70 ppt (range 11.40–25.5 ppt) indicating ongoing contamination. In its 2024 Consumer Confidence Report[9], Pepperell reported a maximum PFOA concentration of 9.91 ppt and a maximum PFOS concentration of 11.60 ppt.

52. In 2024, Pepperell supplied 246 million gallons of water to its customers.

53. Because the PFAS levels detected in Pepperell's water sources exceed EPA's drinking water standards for PFOA and PFOS (an MCL of 4.0 ppt for PFOA and PFOS), Pepperell has taken, and must continue to take, remedial action to eliminate PFAS from its drinking water supply.

54. Pepperell has begun planning and designing a water treatment system to remove PFAS contamination from its water supply in order to protect the health of its residents and consumers and to comply with state and federal drinking water standards. Due to the PFAS contamination, Pepperell must build special filtration facilities to remove PFAS since traditional water treatment technologies do not remove these contaminants.

55. Pepperell has engaged consultants to evaluate, identify, and determine methods to remove PFAS contamination from its water supply and to protect its drinking water supply from ongoing PFAS contamination. Pepperell has incurred and will continue to incur significant cost to design, construct, and operate and maintain this new treatment plant.

56. Water quality monitoring tests reveal the continued presence of PFAS in the public water supply.

---

[9] EPA, pursuant to the Safe Drinking Water Act, requires drinking water systems to provide its consumers annual information on the quality of the drinking water and include water sampling results. *See* 40 C.F.R. Part 141, Subpart O. These Consumer Confidence Reports are also referred to as an Annual Water Quality Report.

57. Pepperell's damages, caused by PFAS contamination, include, but are not limited to, investigation costs, testing and monitoring costs, costs of planning, design, and installation of water treatment systems, treatment, operating and maintenance costs for decades, infrastructure modifications, engineering fees, loss of well capacity, increased reliance on more expensive well sources, interconnection project costs, and other related costs, all to protect its citizens from the harms of PFAS.

58. The Town of Pepperell will be forced to implement extraordinary and costly measures to combat the contamination and to keep water potable for decades to come.

### C. Nashua River PFAS Pollution and Paper Mills' Contribution to It

59. The former Division of Water Supply and Pollution Control, housed within the Public Health Service of the United States Department of Health, Education and Welfare ("Pollution Control Division") was a direct predecessor of what, in 1970, became the EPA.

60. In July 1965, the Pollution Control Division released a report about the pollution of the Nashua River ("Nashua River Pollution Report").[10] On information and belief, by that time the Nashua River was known as one the ten (10) most polluted rivers in the United States, widely characterized as biologically degraded to near dead river conditions, and cited commonly as a textbook industrial pollution case prior to the modern Clean Water Act. The Pollution and Control Division's report concluded that the "principal causes" of the Nashua River pollution are the discharges from paper mills, and that 95 percent of the suspended solids discharged in the Nashua River in Massachusetts come from paper mills in Pepperell and Fitchburg, Massachusetts.

---

[10] *See* U.S. Department of Health, Education, and Welfare, Division of Water Supply and Pollution Control, Region I, "Pollution of Nashua River and Recommendations for Improvement" (July 1965).

61. The Nashua River Pollution Report noted that suspended solids, in the form of paper fibers, could be seen along the banks of the river, and that the pollution from the mills formed a black sludge on the surface. The report also noted that pollution from the paper making process had imparted a white color to the stream from the North Nashua River to its mouth at the Merrimac River.

62. Since the 1960s PFAS compounds, including PFOA and PFOS, have been widely used in the paper industry as internal and external sizing agents and in surface coatings to impart grease, oil, and water repellency to paper and paperboard, especially for food contact and packaging applications.[11]

63. 3M's Scotchban products, containing PFOS-related fluorochemicals, were used historically as grease-proofing agents in paper food packaging, with internal paper company documents indicating PFOS-based "Scotchban" applications in paper dating at least to the 1970s.

64. DuPont's Zonyl series of fluorochemical paper packaging coatings, including Zonyl RP, containing PFOA, have been used in paper and paperboard to impart oil and grease resistance, and regulators have scrutinized PFOA-related contamination from such products. The United States Food and Drug Administration first approved Zonyl for food packaging in 1967.

65. Fluorosurfactants such as DuPont's Zonyl series have been marketed as nonionic and anionic surfactants for use in coatings and other waterborne systems, and the broader zonyl product line includes multiple PFAS-based fluorosurfactants historically available to industrial users. Patents describe this use. *See, e.g.,* U.S. Patent 7,129,284, "Fluorosurfactant packages for use in inkjet printing" (describing Zonyl FSN, FSO, FS-300, FSA and other fluorosurfactants).

[11] *See* U.S. EPA, "Multi-Industry Per- and Polyfluoroalkyl Substances (PFAS) Study – 2021 Preliminary Report" (September 2021) at 7-7 ("EPA documented that PFAS have, and continue to be, used by pulp, paper, and paperboard facilities in the United States"), available at, https://www.epa.gov/system/files/documents/2021-09/multi-industry-pfas-study_preliminary-2021-report_508_2021.09.08.pdf (hereinafter "EPA Multi-Industry PFAS Report").

66. In 2020, the United States Geological Survey ("USGS") collected water samples from 27 rivers and streams in Massachusetts, analyzed them for the presence of PFAS, and released a report of its findings ("USGS PFAS Report").[12] The USGS detected PFAS in samples from all 27 rivers and streams. Some of the highest PFAS concentrations in Massachusetts rivers were measured in samples from the North Nashua River.

67. The USGS PFAS Report found PFOA in the North Nashua River at 42.0 ppt, PFHpA at 19 ppt, and PFBS at 109 ppt, among other types of PFAS. Pepperell detected these contaminants in its groundwater wells, which are upstream of the North Nashua River.

68. The North Nashua River flows from Fitchburg, Massachusetts to join the main Nashua River which flows through Pepperell and eventually empties into the Merrimac River in New Hampshire. The Pepperell groundwater wells are situated in alluvial deposits associated with the Nashua River valley.

69. Pumping from municipal wells adjacent to or hydraulically connected to the Nashua River induces infiltration of river water and associated contaminants into the groundwater system, especially, like in Pepperell, where the aquifer is highly permeable and lacks low permeability confining layers. That is, Pepperell's groundwater water wells pull in water from the Nashau River.

70. Contamination from industrial and commercial operations, like those of the Defendants, can significantly impact groundwater used for Pepperell's drinking water supplies.

71. PFAS were and are released from Defendants' facilities via several pathways. These pathways include wastewater discharges, when PFAS contaminated wastewater is discharged directly into waterways and groundwater; spills, when contamination is spilled on the

[12] *See* USGS, "Concentrations of Per- and Polyfluoroalkyl Substances (PFAS) in Selected Rivers and Streams in Massachusetts, 2020", Data Report 1160, July 20, 2022, Rev. Oct. 2, 2023, available at https://pubs.usgs.gov/publication/dr1160.

ground and leaches into soils and the underground aquifers; via sanitary sewers, which then leak into the ground and groundwater; solid waste, and PFAS contaminated solid waste and/or sludge leaching into groundwater and surface water; air emissions, with PFAS released during the manufacturing processes and depositing on soils and water via atmospheric deposition; surface runoff, where PFAS contaminants on the ground get picked up via rainfall or snowmelt and flow to surface waters.

72. All of the above pathways have been found to be significant migration for PFAS compounds.

73. The extreme stability of PFAS compounds means that natural systems that might filter out or mitigate the migration of other contaminants are not as effective for PFAS compounds.

74. Significantly, the very low threshold for PFAS compounds in drinking water, which is more than several orders of magnitude smaller than many other contaminants, means that even a *de minimis* amount of PFAS can have a big impact on a drinking water supply.

75. As a result of Defendants' actions, omissions, and conduct in the use, release, storage, handling, and/or disposal of PFAS and PFAS-containing materials at, near, or within the vicinity of the source water protection area for Pepperell's Water Source, PFAS have been caused to migrate into and exist in Pepperell's Water Sources and property, thereby damaging and injuring Pepperell.

76. Defendants, as the responsible parties, and not Pepperell, their taxpayers, or their customers, should bear all past, present, and future costs of addressing the above contamination and removing PFAS from the water supply.

77. Upon information and belief, the Defendants are responsible, negligently, intentionally and/or in some actionable manner, jointly and severally, for the events and happenings referred to herein, and caused and continue to cause injuries and damages legally

thereby to the Town of Pepperell, as alleged, either through Defendants' own conduct or through the conduct of their agents, servants or employees, or due to the ownership, maintenance or control of the instrumentality causing them injury, or in some other actionable manner.

## THE PARTIES

### Plaintiff

78. **Plaintiff, TOWN OF PEPPERELL,** is a Municipal Corporation organized under the laws of the Commonwealth of Massachusetts, with its principal place of business located at 1 Main Street, Pepperell MA 01463. Pepperell manages, operates, and controls its water supply system, including maintenance and improvements of the water treatment plant and its five water supply wells.

79. At all relevant times herein, Pepperell owned and operated and has been charged with the responsibility of delivering safe, reliable, and high-quality water that meets state and federal standards to residents and businesses of the Town of Pepperell.

80. At all relevant times herein, the sole source of water utilized by Pepperell to provide drinking water to its residents and businesses is groundwater drawn from the underground aquifer via five (5) gravel-packed wells.

### Defendants

81. Defendants are current and former owners and operators of paper mills, industrial operations, and related facilities that used, handled, and disposed of PFAS and PFAS-containing materials in the course of their business activities in Massachusetts, including at properties they owned and/or operated in and around Pepperell, or upstream thereof. Defendants' facilities released PFAS and PFAS-containing waste into the environment and/or the Nashua River, including into soil and groundwater at and emanating from their properties, and those releases

migrated to and contaminated Pepperell's public drinking water supply wells and underlying aquifer.

82. At all relevant times, Defendants conducted business in Massachusetts as consumers, users, handlers, and/or disposers of PFAS-containing products at their facilities and properties and owned or operated the properties from which PFAS was allowed to migrate to Pepperell's drinking water sources. Defendants disposed of, spilled, discharged, or otherwise released PFAS at their facilities and properties under circumstances in which they knew or should have known that PFAS would be released into surface water, the soil, and groundwater and would contaminate areas containing Pepperell's public drinking water supply wells.

83. As a direct result of Defendants' negligent, careless, wrongful, and otherwise actionable acts and omissions, PFAS entered the surface water, soil and groundwater at and emanating from Defendants' facilities and properties and contaminated the aquifer from which Pepperell draws potable water for its public water supply wells. Defendants' acts and omissions are a direct and proximate cause of the presence of PFAS in Pepperell's drinking water wells and of the injuries and damages suffered by the Town of Pepperell, and those releases and resulting contamination are continuing and ongoing.

84. Any reference to a "Defendant" or "Defendants" in this Complaint includes all named Defendants, jointly and severally, and all predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants. Any reference to acts or omissions of "Defendants" shall be deemed to include acts or omissions committed, authorized, or ratified by Defendants' officers, directors, agents, employees, or representatives, or resulting from Defendants' failure to adequately supervise, control, or direct such persons in the management, operation, or control of Defendants' facilities and properties, while acting within the scope of their employment or agency.

**A. Former Pepperell Paper Mill – Main Street, Pepperell, Massachusetts**

85. The former Pepperell Paper Mill, historically associated with St. Regis Paper Company, was located on the Nashua River at Babbitasset Falls in East Pepperell, Massachusetts, in the vicinity of the Pepperell Hydro Power Plant dam ("Pepperell Paper Mill"). Upon information and belief, the address of the Pepperell Paper Mill was 128 Main Street, Pepperell, Massachusetts.

86. Paper was manufactured at the Pepperell Paper Mill site on the Nashua River for more than 150 years, with the last paper mill operations closing in 2002 and the mill buildings demolished in or around 2011.

87. The Nashua River reach upstream and downstream of the former Pepperell Paper Mill site is part of the Nashua River Basin described by MassDEP.

88. Paper manufacturing at the Pepperell mill was conducted by a succession of companies over time, including an entity referred to locally as "St. Regis Mill" and later operations under the Pepperell Paper Company name, with continuous paper manufacture at the Pepperell Paper Mill until closure in 2002.

89. The Pepperell Paper Mill historically produced "kraft specialties" and other paper products. Specialty kraft paper is a strong, long-lasting paper (the term kraft is derived from a German word for strength). It is made from wood pulp and enhanced with additives or treatments for specific functions like moisture barriers, grease resistance, superior printability, and release properties. "Butcher paper" used for meats and food items is and was a common use for kraft paper. PFAS are ideal for these functions and the Pepperell Paper Mill used PFAS, including PFOA and PFOS or materials containing them, to make kraft specialty paper.

90. In its later years the Pepperell Paper Mill also produced recycled paperboard and "converted paper", which is a product sold to other mills for further processing. Both recycled

paperboard and converted paper are documented sources of PFAS, and the Pepperell Paper Mill used PFAS to produce these products, including PFOA and PFOS or materials containing them.

91. The Pepperell Paper Mill produced various grades of paper, including packaging or specialty papers, utilizing standard papermaking operations such as pulping, stock preparation, forming, pressing, drying, and finishing, with powered operations supported by an adjacent hydroelectric plant built and controlled by the Pepperell Paper Mill.

92. Historic use of large power loads from the hydro plant and the long operational history of the mill support an inference that the Pepperell Paper Mill housed multiple paper machines, coating or sizing stations, boilers, and on-site wastewater handling equipment typical of integrated paper mills of similar size and era.

93. The Pepperell Paper Mill and hydroelectric dam were located directly on the Nashua River, and historical accounts identify paper mill discharges, including from this mill, as contributing to discoloration and "tremendous quantities of suspended solids" in the Nashua River during the era of heavy industrial use.

94. The location of the Pepperell Paper Mill immediately adjacent to the Nashua River, combined with historical patterns of direct process wastewater discharge from paper mills to nearby rivers, supports an inference that the Pepperell Paper Mill facility discharged treated and/or untreated process wastewater and stormwater to the Nashua River via outfalls associated with the mill and the dam tailrace.

95. It was not until the Pepperell Paper Mill closed that NPDES permits for surface water discharges in Massachusetts, including facilities discharging to rivers such as the Nashua, started PFAS monitoring, indicating regulatory recognition of PFAS as potential contaminants in surface water effluents from sources like the Pepperell Paper Mill.

96. As recently as 2021 EPA had not identified any paper mills with PFAS monitoring requirement or effluent limitations.[13] However, in 2021 EPA was able to obtain effluent samples from 23 paper mills and determined an average PFOA concentration of 37.7 ppt and average PFOS concentration of 31.8 ppt in wastewater releases from paper mills.[14]

97. Given the Pepperell Paper Mill's production of kraft specialty papers and the widespread use of PFAS-based sizing and coating agents in specialty and packaging papers from at least the 1960s through the early 2000s, upon information and belief, PFAS-containing fluorochemical sizing agents (*e.g.*, Scotchban-type or Zonyl-type products), including PFOA and PFOS, were used at the Pepperell Paper Mill to impart grease and water resistance to certain paper grades, and to impart other enhancements to the paper products.

98. Upon information and belief, PFAS-based fluorosurfactants, including PFOA and PFOS, were used at the Pepperell Paper Mill as wetting agents, flow modifiers, or retention aids in paper coating formulations, consistent with common industry practice for waterborne coatings at paper mills in the later 20th century.

99. The former Pepperell Paper Mill at Babbitasset Falls lies hydraulically upgradient of the Nashua River reach near Pepperell, and releases of PFAS, including PFOA and PFOS, from the Pepperell Paper Mill property migrated via river water and connected alluvial aquifer sediments downgradient toward Pepperell's public water supply well capture zones. The MassDEP SWAP reports notes the high vulnerability of these wells due in part to the absence of subsurface clay barriers inhibiting migration through the substrate.

100. Groundwater in the area flows toward the northwest, towards Nashau Well No. 1.

---

[13] *See* EPA Multi-Industry PFAS Report, *supra* note 11 at. 7-5.

[14] *See id*. at Table 11.

101. The location of Nashua Well No. 1 relative to the Nashua River and the former Pepperell Paper Mill site, combined with the well's documented PFAS exceedances and the high-vulnerability nature of the aquifer, supports a strong inference that PFAS released from the Pepperell Paper Mill migrated through groundwater and river-connected sediments into the Nashua Well No. 1 capture zone, and ultimately to Pepperell's drinking water.

102. **Defendant GEORGIA-PACIFIC LLC** ("Georgia-Pacific") is a Delaware Limited Liability Company authorized to do business in the Commonwealth of Massachusetts. Its registered agent is United Agent Group Inc., 150 Royall Street, Suite 205, Canton MA 02021.

103. Upon information and belief, in 1971 the James River Paper Company purchased the Pepperell Paper Mill from St. Regis and formed James River-Pepperell, Inc. to operate and own it (collectively, "James River"). James River operated the Pepperell Paper Mill until it sold the mill in the 1990's to Merrimac Paper Company, Inc. In or around 1997, James River merged with Fort Howard Paper Company and formed the Fort James Corporation. In or around 2000, Georgia-Pacific purchased the Fort James Corporation.

104. Georgia-Pacific, as the surviving entity of James River, is liable for PFAS releases from the Pepperell Paper Mill during James River's period as an operator and/or owner of the mill.

**B. Weyerhaeuser Company Mill – Fitchburg, MA**

105. The former Weyerhaeuser paper mill (the "Former Weyerhaeuser Mill") was located on the bank of the North Nashua River in Fitchburg, Massachusetts. On information and belief, the Former Weyerhaeuser Mill is located at or near what is now 44 Old Princeton Road, Fitchburg MA.

106. The Former Weyerhaeuser Mill occupied land adjacent to and upstream of the reach of the North Nashua River that flows past the City of Fitchburg, merges with the Nashua River, and ultimately flows downstream toward Pepperell.

107. The Former Weyerhaeuser Mill consisted of one or more mill buildings, associated process and storage structures, and supporting infrastructure located directly adjacent to the river, drawing power and process water from the North Nashua River.

108. The Former Weyerhaeuser Mill was historically a large paper mill discharging to the North Nashua River in Fitchburg, that the Nashua River Pollution Report, prepared by a predecessor to EPA, identified as a principal source of contamination in the river.[15]

109. Pepperell's Water Source is downstream from Fitchburg on the Nashua River. The Nashua River and hydraulically connected alluvial aquifers in the Nashua River valley, including the North Nashua River, form part of the hydrologic system supplying the Pepperell public water supply.

110. The Former Weyerhaeuser Mill in Fitchburg is approximately 25 river miles from Pepperell municipal groundwater wells, with the Former Weyerhaeuser Mill located generally upstream of Pepperell. This is well within the distance PFAS and other types of pollution can travel.

111. Upon information and belief, the original mill complex at the Former Weyerhaeuser Mill was constructed and operated in the nineteenth century as part of the Crocker or Crocker-Burbank paper enterprises.

112. In or about 1963, Weyerhaeuser Company acquired Crocker's paper mills along the North Nashua River in Fitchburg, Massachusetts, and incorporated them into Weyerhaeuser's paper business.

[15] *See supra* note 10.

113. From approximately 1963 through at least the late 1970s, Weyerhaeuser Company (or a Weyerhaeuser Company subsidiary) owned and operated the paper mill at the Former Weyerhaeuser Mill on the North Nashua River in Fitchburg.

114. The 1965 Nashua River Pollution Report identified "Weyerhaeuser Paper Company" as a major paper mill contributing some of the largest pollutant loadings to the North Nashua River.

115. After Weyerhaeuser's period of ownership, the Former Weyerhaeuser Mill and some other Fitchburg paper mills later passed to other corporate owners (including James River and/or successor entities).

116. During the period from at least 1963 through at least the mid-1980s, Weyerhaeuser Company reported the operation of paper mills in Fitchburg, Massachusetts, in its corporate records and annual reports as part of its fine paper manufacturing segment.

117. During Weyerhaeuser's ownership and operation of the Former Weyerhaeuser Mill (approximately 1963–1970s), the mill produced coated and uncoated printing and writing papers, including fine papers and other grades typical of Weyerhaeuser's Nashua River operations.

118. The papermaking process at the Former Weyerhaeuser Mill included pulping (likely chemical or semichemical pulping of wood or purchased pulp), stock preparation, sheet forming, pressing, drying, calendering, and converting, among other things.

119. By the 1960s–1980s, many large integrated paper mills, including fine paper mills, had installed size presses and/or off-machine coaters to apply starch, pigments, and surface coatings that added PFAS and PFAS-containing products, including PFOA and PFOS, to paper to improve printability and other performance properties. The Former Weyerhaeuser Mill used such coating and sizing equipment PFAS and PFAS-containing products, including PFOA and PFOS.

120. Points at the Former Weyerhaeuser Mill where PFAS-containing materials were introduced into the papermaking system included: wet-end additive addition points (for fluorinated sizing agents or retention aids), size presses, coating kitchens and mixing tanks, coating applicators and pan systems, and finishing operations where treated paper was handled and dried.

121. Beginning in the 1960s and continuing through at least the early 2000s, the paper industry widely used PFAS-containing fluorochemical sizing and coating agents (including PFOS-based chemistries such as 3M's Scotchban) to impart oil, grease, and water resistance to paper and paperboard used in food packaging and other applications.

122. From approximately the 1960s through about 2002, PFOS- and PFOA-related C8 fluorochemicals were commonly used in fluorochemical paper treatment products, after which manufacturers began shifting to shorter-chain and fluorotelomer-based treatments.

123. Weyerhaeuser's Fitchburg mill used PFAS-containing grease- and stain-repellent treatments (such as Scotchban- or Zonyl-type products) in the production of specialty or packaging papers requiring oil and water repellency, consistent with industry practice for mills of this type and period.

124. PFAS-based fluorosurfactants, including DuPont Zonyl products (e.g., Zonyl FSN, FSO, FS-300, FSA), have long been marketed for use in water-based coating and paper manufacturing as wetting agents and flow aids, and such fluorosurfactants were used at Former Weyerhaeuser Mill.

125. Fluorotelomer-based paper treatment chemistries became more prevalent in the 1990s and 2000s as PFOS-based products were phased out, and any grease-resistant paper produced at the Former Weyerhaeuser Mill after about 2002 would plausibly have used C6 or other fluorotelomer-based PFAS chemistries.

126. PFAS-containing processing aids and surfactants, including PFOA-related compounds historically used in fluoropolymer production, were used in various industrial applications, and Weyerhaeuser's Fitchburg mill may have received PFAS-containing chemicals as part of generic surfactant, antifoam, or coating packages supplied by vendors.

127. The Nashua River Pollution Report identifies the Weyerhaeuser Paper Company in Fitchburg as discharging large loads of suspended solids, biochemical oxygen demand, and color to the North Nashua River, and proposed recommended limits on pollutant loadings for Weyerhaeuser's mill.

128. The same report describes large portions of the North Nashua River downstream of the Weyerhaeuser mill as having a white or discolored appearance due to discharges from paper mills, including the Former Weyerhaeuser Mill.

129. During Weyerhaeuser's operation of the Former Weyerhaeuser Mill, process wastewater and non-contact cooling water were discharged from the mill to the North Nashua River, with on-site treatment consisting, at times, of primary and potentially secondary treatment. Any on-site treatment was not effective to remove PFOA and PFOS, and other PFAS, from these wastewaters.

130. Sludge generated from the Former Weyerhaeuser Mill's wastewater treatment (including primary clarifier sludge, secondary biological sludge, and paper machine and coating waste) was managed through on-site storage, dewatering, and disposal or off-site transport, which may have included on-site lagoons, landfills, or off-site land disposal.

131. Mechanisms for PFAS release, including PFOA and PFOS, from the Former Weyerhaeuser Mill to the North Nashua River and surrounding environment include: (a) discharge of PFAS-containing process wastewater and stormwater via outfalls to the river; (b) seepage and leakage from on-site wastewater treatment units, lagoons, or surface impoundments into

underlying soil and groundwater; (c) leachate from on-site landfills or sludge disposal areas; and (d) accidental spills or leaks of PFAS-containing chemicals during storage, handling, and transfer.

132. The Nashua River Pollution Report predates PFAS recognition and does not contain PFAS data, but documents severe historical pollution from the Weyerhaeuser mill, confirming substantial historic waste discharges to the North Nashua River.

133. In 2020, the USGS PFAS Report found PFOA in the North Nashua River at 42.0 ppt (10 ten times EPA's regulatory limit for drinking water), among other types of PFAS. Pepperell detected both in its groundwater wells.

134. The North Nashua River flows from Fitchburg downstream to join the Nashua River which continues toward Pepperell. Pepperell's groundwater wells are situated in alluvial deposits associated with the Nashua River valley.

135. Pumping from municipal wells adjacent to, or hydraulically connected to, the Nashua River induces infiltration of river water and associated contaminants into the groundwater system. This risk is particularly elevated in Pepperell, where the aquifer is highly permeable and lacks low permeability confining layers.

136. PFAS, including PFOA and PFOS, released from the Former Weyerhaeuser Mill into the North Nashua River mixed with river water and was transported downstream, with some portion partitioning into sediments and shallow alluvial groundwater along the Nashua River valley between Fitchburg and Pepperell.

137. PFAS-laden river water and alluvial groundwater reached the vicinity of the Pepperell groundwater wells and pumping of those wells induced infiltration from the river, thereby drawing PFAS into the groundwater captured by the wells, and ultimately to Pepperell's drinking water.

138. PFOA, PFOS, and other PFAS released from the Former Weyerhaeuser Mill are a plausible and significant contributor to PFAS transported downstream to Pepperell's Water Source.

139. **Defendant WEYERHAEUSER COMPANY** is a Washington Corporation authorized to do business in the Commonwealth of Massachusetts. Its registered agent is Corporation Service Company, 300 Deschutes Way SW, Suite 208 MC-CSC1, Tumwater WA 98501.

140. Upon information and belief, Weyerhaeuser Company owned and operated the Former Weyerhaeuser Mill from approximately 1963 to at least the mid 1970's.

141. Weyerhaeuser Company is liable for PFAS releases, including but not limited to releases of PFOA and PFOS, from the Former Weyerhaeuser Mill during its period of ownership and/or operation.

142. Upon information and belief, **James River** purchased most of the Former Weyerhaeuser Mill in or around 1972 and continued to operate this mill during the 1970s and 1980s.

143. James River operated its portions of the mill for several decades as a specialty mill and produced paperboard and other paper products.

144. In or around 1997, James River merged with Fort Howard Paper Company and formed the Fort James Corporation. In or around 2000, Georgia-Pacific purchased the Fort James Corporation.

145. **Defendant GEORGIA-PACIFIC, LLC**, as the surviving entity of James River, is liable for PFAS releases, including but not limited to releases of PFOA and PFOS, from the Former Weyerhaeuser Mill during James River's period as an operator and/or owner of the mill.

146. Upon information and belief, Custom Papers Group Inc. became the owner and/or operator of the Former Weyerhaeuser Mill in or around 1991. In 1996, FiberMark, Inc. ("FiberMark") acquired Custom Papers Group Inc. Subsequently, in 2015, Neenah Paper, Inc. acquired FiberMark.

147. **Defendant NEENAH PAPER, INC.** ("Neenah") is a Delaware Corporation authorized to do business in the Commonwealth of Massachusetts. Neenah's registered agent is Corporate Creations Network, Inc., 150 Royall Street, Suite 205, Canton MA 02021.

148. As the owner of FiberMark, Neenah is liable for PFOA, PFOS, and other PFAS releases from the Former Weyerhaeuser Mill during the time FiberMark owned and/or operated it.

**C. Fitchburg Paper Company Mill – 642 River Street, Fitchburg, MA**

149. The former paper mill generally known as the Fitchburg Paper Company Mill is or was located at 642 River Street, Fitchburg, Massachusetts 01420, on the east bank of the North Nashua River within Worcester County, Massachusetts, approximately 25 miles upstream of Pepperell's Water Source (the "Former Fitchburg Paper Mill").

150. Upon information and belief, since at least the 1930s the Former Fitchburg Paper Mill has historically been used as a paper mill and industrial site adjacent to the North Nashua River. The Former Fitchburg Paper Mill occupies, or occupied, many acres and consists, or consisted, of multiple interconnected mill buildings, paper machine halls, coating and finishing areas, boiler and power-house structures, storage buildings, and paved yard areas.

151. The Former Fitchburg Paper Mill lies immediately adjacent to the North Nashua River, with portions of the property extending to the riverbank and with process areas and outfalls historically located within a short distance of the river channel.

152. At all times relevant to this action, the Former Fitchburg Paper Mill was engaged in the manufacture of specialty and decor papers, including papers intended for use in laminates, coatings, and other technical applications.

153. The Former Fitchburg Paper Mill's production processes included pulp preparation, papermaking on one or more paper machines, coating, calendaring, drying, finishing, and packaging of specialty paper products, among other things.

154. On information and belief, based on industry practice and safety data sheets for comparable products, the decor and specialty papers manufactured at the Former Fitchburg Paper Mill were treated with coating and sizing formulations that included fluorinated chemicals like PFAS, and PFAS-containing products, designed to impart oil, water, stain, or heat resistance.

155. During the period of PFAS use and discharge alleged herein, the Former Fitchburg Paper Mill generated large volumes of industrial wastewater and solid wastes, including process water, white water, machine cleaning water, coating and chemical residuals, paper sludge, and boiler ash.

156. The Former Fitchburg Paper Mill has been a well-known and significant source of contamination of the Nashua River since at least the 1960s, including contamination reaching Pepperell.

157. The Former Fitchburg Paper Mill discharged treated and/or untreated wastewater to the North Nashau River. After release of the Nashua River Pollution Report in 1965, the mill's wastewater system included primary and secondary treatment units, clarifiers or settling basins, sludge handling facilities, and one or more permitted outfalls conveying effluent directly to the North Nashua River. However, this treatment was not and is not designed to remove PFAS contamination.

158. In addition to wastewater, stormwater runoff from the Former Fitchburg Paper Mill's paved yards, roofs, and chemical storage areas flows, or historically flowed, via surface channels, storm drains, and outfalls into the Nashua River or its adjacent floodplain.

159. On information and belief, based on permit files and Discharge Monitoring Reports ("DMRs"), the Former Fitchburg Paper Mill's permitted effluent parameters historically included conventional pollutants and, in later years, certain toxic pollutants, but did not require routine monitoring for PFAS because PFAS, as an emerging contaminant, were not regulated during the time of the paper mill's operation.

160. On information and belief, based on MassDEP Waste Site Cleanup listings and related documents, the Former Fitchburg Paper Mill experienced releases of petroleum and other contaminants, including #6 fuel oil, that resulted in soil and groundwater contamination and triggered remedial obligations at the site.

161. In light of the Former Fitchburg Paper Mill's manufacture of PFAS-treated paper products, its use of PFAS and PFAS-containing materials, its discharge of wastewater to the North Nashua River, and the high solubility, mobility, and environmental persistence of PFAS, PFAS-containing process wastewater and stormwater, including PFOA and PFOS, were released, and continue to be released, from the facility into the Nashua River.

162. Based on typical paper mill waste handling practices and MassDEP/EPA guidance, the PFAS-containing sludges and residuals generated at the Former Fitchburg Paper Mill were historically disposed of onsite and/or offsite in a manner that allowed PFAS to leach to groundwater and/or surface water connected to the Nashua River.

163. Based on the timing of PFAS detections and the Former Fitchburg Paper Mill's operational history, the Former Fitchburg Paper Mill's operations are a significant source of PFAS, including PFOA and PFOS, to the Nashua River and downstream receptors.

164. The Pepperell Water Source is located hydraulically downgradient of the Former Fitchburg Paper Mill along the Nashua River corridor, approximately 25 river miles downstream.

165. Based on hydrogeologic assessments and published studies, Pepperell's groundwater wells draw groundwater that is hydraulically connected to the Nashua River through bank filtration and induced infiltration, such that PFAS in the Nashua River can and do migrate into the groundwater tapped by the Pepperell wells.

166. PFOA, PFOS, and other PFAS released from the Former Fitchburg Paper Mill into the Nashua River have migrated downstream via river flow and surface-water/groundwater interaction and have contributed to PFAS contamination detected in Pepperell's Water Source.

167. Based on industry publications and regulatory correspondence, the Former Fitchburg Paper Mill defendants were aware, or should have been aware, that PFAS compounds used in paper and coating formulations are persistent, mobile, and capable of contaminating drinking water sources.

168. Despite this knowledge, the Former Fitchburg Paper Mill did not implement adequate controls at the Former Fitchburg Paper Mill to eliminate or minimize PFAS discharges to the Nashua River or to prevent PFAS-containing wastes from contaminating soil and groundwater.

169. Based on regulatory records and the Former Fitchburg Paper Mill's operational history, the Former Fitchburg Paper Mill failed to monitor for PFAS in their discharges, failed to report PFAS releases, and failed to implement timely remedial measures at the Former Fitchburg Paper Mill.

170. The Former Fitchburg Paper Mill has experienced, and continues to experience, "releases" and "disposals" of PFAS, including PFOA and PFOS, as those terms are used in environmental statutes, into the environment via direct discharge to the Nashua River, leaching

from contaminated soils and sludges into groundwater and surface water, and migration of PFAS-contaminated particles and sediment.

171. These releases have contributed to PFAS contamination in the Nashua River and connected groundwater, and to the PFAS contamination in Pepperell's Water Source.

172. As a direct and proximate result of PFAS releases from the Former Fitchburg Paper Mill, Pepperell has suffered, and will continue to suffer, property damage, loss of use and enjoyment of its water resources, and significant costs to investigate, monitor, and remediate PFAS contamination in its water supply now and for decades to come.

173. **Defendant AHLSTROM-MUNKSJO PAPER INC.** ("Ahlstrom") is a Delaware Corporation authorized to do business in the Commonwealth of Massachusetts. The name and address of its registered agent is Business Filings Incorporated, 155 Federal Street, Suite 700, Boston MA 02110.

174. Following a series of corporate mergers and acquisitions, Ahlstrom is now the surviving entity and/or owner of what was known as the Former Fitchburg Paper Mill. Ahlstrom and its corporate predecessors owned and/or operated the Former Fitchburg Paper Mill since at least the 1990s until its closure in the early 2020s.

175. As the owner and prior operator, Ahlstrom is liable for PFAS releases from the Fitchburg Paper Mill and contamination of the Pepperell Water Supply. Ahlstrom is liable under CERCLA as the current owner and operator of the Fitchburg Paper Mill, regardless of when the releases of hazardous substances from that facility first occurred. Ahlstrom is also liable as the former operator of the Fitchburg Paper Mill. As a "person" who is the present owner and operator of a "facility" within the meaning of 42 U.S.C. § 9601(21) and (9), Ahlstrom is strictly liable under 42 U.S.C. § 9607(a)(1) for "all costs of removal or remedial action incurred" by Pepperell in response to "a release or a threatened release of a hazardous substance" from that facility, even if

some or all of the releases took place years or decades before Ahlstrom's current ownership or operation, or before Pepperell incurred its response costs. CERCLA does not require Pepperell to prove that Ahlstrom owned or operated the facility at the precise time each historical release occurred; it is enough that Ahlstrom is the current owner and operator of a facility from which there has been a release or threatened release of hazardous substances for which Pepperell has incurred necessary response costs consistent with the National Contingency Plan.

**D. Former Conductorlab, Inc. Site – Groton, Massachusetts**

176. The Conductorlab facility is located at or near 430 Main Street, Groton, Massachusetts, and was operated as a circuit board and semiconductor production facility between 1958 and 1985 ("Conductorlab"). In 1985, it became public knowledge that operations at the facility had released several hazardous chemicals, most notably hexavalent chromium and trichloroethylene (TCE). Initial investigations determined that soil and groundwater had been impacted both on and down-gradient of the property. This contamination required the abandonment of residential water wells and extension of town water throughout the impacted area. The Conductorlab property was designated a "Disposal Site" in accordance with the Massachusetts Contingency Plan and became subject to oversight and enforcement by MassDEP.[16] Over its history, the Conductorlab facility has changed ownership several times.

177. PFAS-based anti-fuming agents were used in the electroplating and semiconductor industries at the time this plant was active. Trade and technical literature on PFAS-containing anti-fuming agents and surfactants demonstrate PFAS were used historically in

[16] The Massachusetts Contingency Plan is the state's regulatory framework to assess and clean up oil and hazardous material releases. *See* 310 CMR 40.0000.

printed-circuit-board manufacturing, focusing on PFOS- and fluorotelomer-based mist and fume suppressants and wetting agents used in plating and etching lines in the 1960s–1980s.

178. The Conductorlab facility manufactured printed circuit boards and semiconductors and historically used process chemicals, including PFAS and products containing PFOS, PFOA, and PFAS, that have already caused documented releases of chlorinated volatile organic compounds (VOCs) and chromium to soil, groundwater, surface water, and sediments.

179. Migration pathways from Conductorlab include (i) discharges of process wastewater to on-site drains, injection trenches, or leaching structures; (ii) spills and leaks from plating lines, chemical storage, and drum handling areas infiltrating the building slab and underlying fill; and (iii) stormwater runoff from paved and unpaved yard areas where wastes or sludges were stored, draining toward the unnamed brook west of the site.

180. The Conductorlab facility is underlain by a high-vulnerability stratified aquifer hydraulically connected to the Jersey Street Wells in Pepperell and the Nashua River. Contaminants released from the former Conductorlab facility reach the Pepperell groundwater supply primarily via the shared stratified aquifer that underlies both Conductorlab and the Jersey Street wellfield's Zone II recharge area, with additional contributions via surface-water pathways to the Nashua River and induced bank infiltration. The Jersey Street Wells pump from a highly vulnerable sand-and-gravel aquifer whose Zone II recharge area extends into Groton, meaning the Jersey Street wells capture contaminants entering groundwater in Groton.

181. The Conductorlab facility historically used PFAS-based anti-fuming agents, that included PFOA and PFOS, prompting MassDEP to request a focused PFAS groundwater assessment at the site beginning in 2025.

182. **Defendant HONEYWELL INTERNATIONAL INC.** ("Honeywell") is a Delaware Corporation authorized to do business in the Commonwealth of Massachusetts. It's registered agent is Corporation Service Company, 84 State Street, Boston MA 02109.

183. Honeywell is the current owner of the Conductorlab facility.

184. On information and belief, Honeywell has been the potentially responsible party taking charge of ongoing environmental investigations at the Conductorlab facility.

185. As the owner, Honeywell is liable for PFAS releases, including releases of PFOA and PFOS, from Conductorlab and contamination of the Pepperell Water Supply. Honeywell is liable under CERCLA as the current owner and operator of Conductorlab, regardless of when the releases of hazardous substances from that facility first occurred. As a "person" who is the present owner and operator of a "facility" within the meaning of 42 U.S.C. § 9601(21) and (9), Honeywell is strictly liable under 42 U.S.C. § 9607(a)(1) for "all costs of removal or remedial action incurred" by Pepperell in response to "a release or a threatened release of a hazardous substance" from that facility, even if some or all of the releases took place years or decades before Honeywell's current ownership or operation, or before Pepperell incurred its response costs. CERCLA does not require Pepperell to prove that Honeywell owned or operated the facility at the precise time each historical release occurred; it is enough that Honeywell is the current owner and operator of a facility from which there has been a release or threatened release of hazardous substances for which Pepperell has incurred necessary response costs consistent with the National Contingency Plan.

**E. Hollingsworth & Vose Facility – West Groton, MA**

186. **Defendant HOLLINGSWORTH & VOSE COMPANY** ("Hollingsworth") is a domestic Massachusetts' Corporation. Hollingsworth's registered agent is Mark S. Freeman, Hollingsworth & Vose Company, 112 Washington Street, East Walpole MA 02032.

187. Hollingsworth owns and operates a facility at 219 Townsend Road, West Groton MA, where for decades it has manufactured specialty paper and paper-based filtration media along the Squannacook River, a tributary of the Nashua River ("H&V Facility").

188. The H&V Facility has a long history at this site and was discussed in the 1965 Nashua River Pollution Report as a paper mill contributing to the substantial pollution of the Nashua River.

189. PFAS were and are used in the production of specialty paper and paper-based filtration media for, among other things, as fluorinated surfactants used in wet processes such as dispersion, coating uniformity, and foam control; as surface treatments to repel oil and water; and for resin binder systems as an additive. The H&V Facility used PFOA, PFOS, other PFAS, and/or PFAS containing products for these and other purposes.

190. In 2024, Hollingsworth announced the introduction PlusZero, its new line of products manufactured without using PFAS. Hollingsworth developed PlusZero after years of research. This shows Hollingsworth has knowledge of PFAS use in its business and operations, the experience and expertise to apply PFAS in its operations, and intent to have used it previously.

191. The H&V Facility's operations generate process wastewater, laboratory wastewater, stormwater, and sludges that are collected, treated, and discharged through NPDES Outfall 001 (Permit No. MA0004561) to the Squannacook River, a tributary of the Nashua River that flows downstream to Pepperell's Water Source.

192. The MassDEP state surface-water discharge permit and section 401 water quality certification for MA0004561 establish that PFAS are present, or are reasonably anticipated to be present, in the H&V's Facility's effluent and sludge, and therefore at and from the facility. These regulatory documents impose PFAS sampling requirements on Hollingsworth, mandate concurrent sampling of effluent, sludge, and Squannacook River intake water for six PFAS compounds, and

allow modification of certain permit conditions for PFAS only if H&V "sufficiently demonstrates that the detected PFAS compounds in the effluent are from the intake water from the Squannacook River and not from the H&V facility," thereby confirming that PFAS detections in facility effluent are anticipated and are the focus of regulatory control.

193. Pepperell's SWAP Report confirms that Pepperell's Jersey Street wells are gravel-packed wells screened in a highly vulnerable sand and gravel aquifer with no significant confining clay layers to prevent contaminant migration. The Zone II recharge area for the Jersey Street wellfield extends across the municipal boundary into the Town of Groton, placing portions of Groton—including land downgradient of the Hollingsworth & Vose discharge and the Nashua River corridor—within the primary recharge area for the Jersey Street wells.

194. From a hydrologic standpoint, PFAS-containing effluent discharged from Hollingsworth & Vose to the Squannacook River is conveyed downstream to the Nashua River, where PFAS can infiltrate from surface water through riverbed sediments and riparian deposits into the shallow sand and gravel aquifer that underlies Pepperell's Zone II recharge areas. Because the Jersey Street wells are screened in this unconfined, highly permeable aquifer and have capture zones that extend toward and beneath the Nashua River corridor, PFAS in river water and hyporheic-zone groundwater can migrate with regional groundwater flow into the capture zones of those wells, causing and contributing to the PFAS detections observed in Pepperell's Water Source.

195. In addition, PFAS released from the V&S facility entered the Squannacook River and are then conveyed down the Nashua River to Pepperell's Water Source. Pumping from Pepperell's groundwater wells, such as Nashua Well No. 1, that are adjacent to or hydraulically connected to the Nashua River can induce infiltration of river water and associated contaminants

into the groundwater system because Pepperell's Water Source lack hydrogeological barriers like clay that may otherwise impede this migration.

196. Scientifically, PFAS compounds are highly persistent and mobile in groundwater, meaning that PFAS released to surface water and shallow groundwater can travel considerable distances downgradient from a source area and remain detectable at low concentrations in public-supply wells many miles away. The USGS Nashau River study shows that PFAS are present in the river, with industrial releases identified as important sources, consistent with the H&V Facility's PFAS-monitored discharges into the Squannacook–Nashua system as a plausible and significant contributor to PFAS burdens in Pepperell's Water Source.

197. Under CERCLA, the H&V Facility is a "facility" from which there has been a "release" and "threatened release" of "hazardous substances" and/or "pollutants or contaminants," including PFAS in effluent and sludge, into the environment in the form of discharges to surface water, disposal or management of PFAS-bearing residuals, and potential past releases to soil and groundwater. Hollingworth is a "person" and "owner or operator" of this facility and, by generating and discharging PFAS-containing or PFAS-affected wastes, that contain PFOA and PFOS, into the Squannacook River and Nashua River watershed with knowledge of PFAS persistence and mobility, has caused and contributed to releases that have migrated, and continue to migrate, into the groundwater feeding Pepperell's Jersey Street Wells, Nashua Well No. 1, and Bemis Road wells, thereby triggering response actions and costs recoverable under CERCLA.

198. In addition to direct surface-water-to-groundwater migration, Hollingsworth's operations plausibly have contributed PFAS to the environment via PFAS-containing sludges and residuals managed offsite and via air emissions from process vents and dryers, which can deposit PFAS on soils and surface waters within the Nashua River basin. PFAS in land-applied biosolids, landfills, and downgradient wastewater-treatment-plant effluent—containing H&V's PFAS-laden

waste streams —can leach into groundwater, increasing the aggregate PFAS burden in the aquifer tapped by Pepperell's groundwater wells.

199. H&V's PFAS-monitored effluent is not the only PFAS source in the Nashua River basin (as discussed above), but it is a uniquely documented industrial contributor immediately upstream of Pepperell's Zone II recharge areas, and its long history as a specialty paper and filtration-media mill in an industry known for PFAS-based treatments makes it a particularly significant source relative to diffuse, non-point PFAS inputs. When combined with other upgradient sources, H&V's discharges have materially increased PFAS concentrations in the Squannacook and Nashua Rivers and the connected aquifer, thereby materially contributing to the levels measured in Pepperell's Jersey Street, Nashua Well No. 1, and Bemis Road wells.

200. Hollingsworth owed a duty to exercise reasonable care in handling, using, and discharging PFAS-containing materials and wastes so as not to contaminate neighboring communities' drinking-water resources. Given the proximity of the Nashua River, the absence of confining layers in Pepperell's aquifer, and the extension of the Jersey Street Zone II into Groton, it was foreseeable that releases of PFAS into the Squannacook–Nashua system would reach and impair Pepperell's wellfields. By discharging PFAS-impacted effluent to the Squannacook River and generating PFAS-bearing sludges and residuals that entered the regional hydrologic system, Hollingsworth negligently, unreasonably, and unlawfully interfered with Pepperell's property rights and public water-supply system, causing PFAS contamination and threatened contamination that constitute a continuing nuisance and trespass and that have directly resulted in Pepperell's substantial investigation, treatment, and replacement-water costs.

201. Hollingsworth is liable to the Town of Pepperell under 42 U.S.C. § 9607(a) as a current owner and operator of a facility and as an arranger for disposal or treatment of hazardous substances from which there have been releases and threatened releases of PFAS, including PFOA

and PFOS, into the environment, which releases and threatened releases have caused the Town to incur necessary response costs consistent with the NCP. Hollingsworth is therefore jointly and severally liable for all such response costs incurred and to be incurred by Pepperell in investigating, monitoring, treating, remediating, and otherwise responding to PFAS contamination and threatened contamination of its Jersey Street, Nashua Well No. 1, and Bemis Road drinking-water wells.

## <u>FIRST CAUSE OF ACTION</u>
## Cost Recovery Liability Pursuant to 42 U.S.C. § 9607 (CERCLA)

202. Pepperell incorporates by reference the preceding paragraphs as though fully set forth herein.

203. Under CERCLA, 42 U.S.C. §§ 9601, *et seq*., owners and operators of facilities are liable for "costs of response incurred by any…person" occasioned by a "release, or a threatened release which causes the incurrence of response costs, of a hazardous substance," and other forms of compensation. 42 U.S.C. § 9607(a).

204. Pepperell is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

205. Each Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

206. Each Defendant is, or was, an "owner" and/or "operator" within the meaning of Section 101(20) of CERCLA, 42 U.S.C. § 9601(20).

207. Each of Defendants' locations identified above is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

208. CERCLA defines the term "release" broadly and it means, among other things, "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment…." 42 U.S.C. § 9601(22).

209. PFOA and PFOS are each a "hazardous substance" within the meaning of Section 101(14) of CERCLA, 42 U.S.C. § 9601(14), by designation pursuant to section 102 of CERCLA, 42 U.S.C. § 9602.

210. There have been "releases", and/or continue to be releases, and/or disposal of PFOA and PFOS from each Defendant's facility within the meaning of Section 101(22) of CERCLA, 42 U.S.C. § 9601(22). Upon information and belief, these releases or threatened releases are ongoing.

211. The hazardous substances released from Defendants' facilities were, and are being, released within or migrated to Pepperell's Water Source.

212. Pepperell has incurred and will continue to incur necessary response costs pursuant to CERCLA § 107(a), all of which are, and will be, consistent with the national contingency plan, as a result of the release and/or threatened releases of hazardous substances from Defendants' facilities.

213. Each Defendant is therefore a responsible party pursuant to Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), and liable for necessary response costs as the owner or operator of a facility from which there was a release of hazardous substances that have contaminated Pepperell's public drinking water supply.

214. By reason of the foregoing, Defendants are liable, jointly and severally, for Pepperell's necessary response costs, and damages regarding contamination to Pepperell's public water supply from PFOA and PFOS.

## SECOND CAUSE OF ACTION

**Declaratory Judgment Pursuant to 42 U.S.C. §§ 9607(a) and 9613(g)(2) (CERCLA)**

215. Pepperell incorporates by reference the preceding paragraphs as though fully set forth herein.

216. CERCLA § 113(g)(2) provides in pertinent part: "In any action described in this subsection [, which includes 42 U.S.C. §§ 9607(a),] the court shall enter a declaratory judgment of liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 113 (g)(2).

217. By reason of the foregoing and pursuant to Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), Pepperell is entitled to a declaratory judgment on liability and damages under 42 U.S.C. § 9607(a) for costs to remove and/or remediate the hazardous substances, *i.e.*, PFOA and PFOS, in Pepperell's public drinking water supply as referenced herein.

218. A declaratory judgment will prevent the need for multiple lawsuits as Pepperell continues to incur costs for which Defendants are liable and will provide a resolution of the issue between the parties regarding further liability for future costs.

219. A declaratory judgment will establish Defendants' allocation of costs associated with addressing the contamination of the public water supply, insuring an equitable and efficient response to the problem.

220. Public interest will be served in that a declaratory judgment will ensure a prompt and environmentally proper response to the contamination of Pepperell's public drinking water supply.

221. Pepperell will continue to incur additional remedial and response costs, including but not limited to costs to investigate, test, monitor, design, install, operate and maintain treatment

systems, and take other measures to address the contamination of its property and its drinking water supply with hazardous substances.

222. Pepperell's costs are and will be consistent with the National Contingency Plan, 40 C.F.R. Part 300.

223. Pepperell is thus entitled to a declaratory judgment regarding Defendants' liability for response costs and damages that will be binding on subsequent actions to recover further response costs or damages.

## THIRD CAUSE OF ACTION
## Continuing Public Nuisance

224. Pepperell incorporates by reference the preceding paragraphs as though fully set forth herein.

225. Pepperell, its residents, and businesses have the common law right to clean, safe, potable source of water of their own choosing.

226. The use, enjoyment, and existence of uncontaminated natural resources is a right common to the general public.

227. Pepperell supplied a clean, safe, portable source of water until it was discovered that PFAS contamination had migrated to Pepperell's water supply.

228. Defendants by their negligent, reckless, and willful acts have caused the release of PFAS from their facilities that, because their facilities are located within the source water protection area for Pepperell's Water Source, and PFAS released from them migrated into Pepperell's Water Source.

229. Defendants released PFAS through direct discharge, water emissions, air deposition, spills, runoff, during defendants' respective manufacturing or operations, and as part of industrial wastewater and solid waste.

230. By their actions, Defendants have unreasonably and substantially interfered with and/or endangered (i) the public right to pure drinking water as well as a clean and unpolluted natural environment, including reserves of unpolluted groundwater; (ii) Pepperell's special status and authority regarding its natural resources; (iii) Pepperell's ability to protect, conserve, and manage its natural resources; and (iv) the rights of the people and its citizens to enjoy their natural resources from interference by pollution and contamination.

231. Defendants' conduct has injured the property, health, safety and/or comfort of a considerable number of persons.

232. The public nuisance caused by the presence of PFAS in Pepperell's drinking water supply, both existing concentrations and those still migrating to it, has affected the public at large and has had, and will continue to have, a significant impact.

233. The acts and omissions of Defendants unreasonably and significantly interfered with, and continue today to unreasonably and significantly interfere with, the common rights of Pepperell, its residents, and business, to a safe source of drinking water of their own choosing, and have caused and continue today to cause, detrimental effects on the public health, welfare, safety, comfort, and convenience of the residents and businesses, thus creating a public nuisance.

234. Defendants knew or, in the exercise of reasonable care should have known, that the release of PFAS into natural resources and Pepperell's Water Source would and has unreasonably and seriously endangered, injured, and interfered with the ordinary comfort, use, and enjoyment of vital groundwater resources relied upon by Pepperell and the public.

235. As a direct and proximate result of Defendants' conduct, they have created an ongoing public nuisance, and Pepperell has incurred substantial damages, and will incur additional damages to remove PFAS from the public water supply so Pepperell can provide its residents and consumers with clean and healthy water.

236. The interference with Pepperell's ability to deliver uncontaminated drinking water far outweighs any social utility of Defendants' actions.

237. As a direct result of the foregoing, Pepperell seeks compensatory damages in a sum to be determined by a jury at the time of trial.

## FOURTH CAUSE OF ACTION
### Continuing Trespass

238. Pepperell incorporates by reference the preceding paragraphs as though fully set forth herein.

239. Pepperell is the owner, operator, and actual possessor of real property and improvements used for collecting drinking water from Pepperell's Water Source and delivering drinking water to the residents and users of it.

240. Defendants intentionally engaged in the actions that caused the release of PFAS from their facilities.

241. Upon information and belief, Defendants knew, or should have known, that PFAS contamination migrated through groundwater and surface water contaminating Pepperell's real property used for collecting, treating, and delivering drinking water and the drinking water itself.

242. Defendants did not and do not have authority, privilege, or permission to trespass upon Pepperell's property interests.

243. The acts and omissions of Defendants caused the PFAS contamination to migrate, via surface soils and sediments, stormwater runoff, the ground, the Nashua River and its tributaries, and groundwater, contaminating Pepperell's real property used for collecting, treating, and distributing drinking water, interfering with its property rights, including Pepperell's right to the full use and enjoyment of its water system for treatment and distribution to residents and

businesses. These acts and omissions created a trespass on Pepperell's property and unlawful interference with Pepperell's property rights.

244. As a direct and proximate cause of Defendants' conduct in creating an ongoing trespass against Pepperell's property, in the form of the ongoing PFAS contamination of Pepperell's water system, Pepperell has incurred substantial damages and will incur additional damages to remove PFAS from the public water supply in order to provide their residents and customers with clean and healthy water.

245. As a direct result of the foregoing, Pepperell seeks compensatory damages in a sum to be determined at the time of trial.

**FIFTH CAUSE OF ACTION:**
**Negligence**

246. Pepperell incorporates by reference the preceding paragraphs as though fully set forth herein.

247. Defendants knew or should have known that PFAS and PFAS-containing products and materials, and other toxic chemicals, create a substantial risk of harm to groundwater and to members of the public who consume such groundwater.

248. Defendants knew or should have known that the chemicals containing PFAS and other toxic substances which they were distributing, purchasing, transporting, using, processing, mixing, storing, handling and/or disposing create a substantial risk of harm contaminating the soil, surface waters, groundwater, the aquifer and therefore, Pepperell's Water Source.

249. Defendants negligently distributed, stored, transported, and/or disposed of, or willfully, wantonly, and intentionally spilled, disposed of, or otherwise permitted the release of PFAS at and from their facilities and/or properties as to cause severe contamination of surface waters, soil, groundwater, and/or the aquifer, and/or said Defendants own or owned the properties

upon which such actions and/or results occurred.

250. Defendants owed Pepperell a duty to act as reasonable operators and/or owners of property and to take all necessary precautions to prevent the release of PFAS and other toxic chemicals into the soil, surface waters, and groundwater at their properties.

251. Defendants owed Pepperell a cognizable duty to exercise reasonable care in the purchasing, transporting, using, processing, mixing, storing, handling and/or disposing of PFAS and/or in owning property upon which such actions and/or results occurred to take reasonable measures to prevent the release and spread of PFAS and other toxic chemicals into the hydrological features and into Pepperell's Water Source.

252. Defendants owed Pepperell a duty to act as reasonable operators and/or owners of property and to take all necessary steps to prevent the continuing and future release of PFAS from their facilities and/or properties.

253. Upon learning of the release of solvents and compounds, including but not limited to PFAS containing products, PFAS, and other toxic chemicals, at their facilities and/or properties, Defendants owed Pepperell a duty to act reasonably to remediate, contain, and eliminate the release before it contaminated Pepperell's Water Source.

254. Defendants breached the above duties and failed to prevent the releases of PFAS containing products at their properties.

255. Defendants also failed to take reasonable, adequate, and sufficient actions to eliminate, correct, or remedy the releases of PFAS and other toxic chemicals after they occurred.

256. Defendants continue to breach their duties to remediate and prevent ongoing and future releases of PFAS and other toxic chemicals from their properties into Pepperell's Water Source.

257. As a result of Defendants' breaches of their duties, Pepperell has expended and

will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' contamination for many years into the future.

258. Defendants' respective breach of their duties was the direct, sole and proximate cause of Pepperell's damages.

259. As a direct result of the foregoing, Pepperell seeks compensatory damages in a sum to be determined by a jury at the time of trial.

**SIXTH CAUSE OF ACTION:**
**Failure To Warn**

260. Pepperell incorporates by reference the preceding paragraphs as though fully set forth herein.

261. Defendants breached their duty to notify and warn Pepperell of the likelihood of release of hazardous substances, including but not limited to PFAS and other toxic chemicals, at and in the vicinity of Defendants' facilities, and, consequently, in the capture zone of Pepperell's Water Source.

262. Upon learning of the release of hazardous substances, including but not limited to PFAS and/or products containing PFAS, and other toxic chemicals at their facilities and/or properties, Defendants owed Pepperell a duty to timely notify and warn Pepperell of the releases.

263. Defendants breached that duty by failing to timely notify and warn Pepperell of the releases of hazardous substances, including but not limited to PFAS and other toxic chemicals, on and under their properties and, consequently, into Pepperell's Water Source.

264. As a result of Defendants' breaches of their duty to warn Pepperell, Pepperell was forestalled from undertaking effective and immediate remedial measures, and Pepperell has expended and will be forced to expend significant resources to test, monitor, and remediate the effects of Defendants' negligence for many years into the future.

265. As a direct and proximate result of Defendants' above-described failure to provide warnings, Pepperell has incurred and will continue to incur the following damages:

a. Existing contamination of Pepperell's water supply, which may have been prevented or mitigated if timely warnings were given;

b. Costs of additional testing and monitoring of the hydrological features and Pepperell's drinking water wells for hazardous substances, including but not limited to PFAS and other toxic chemicals' contamination;

c. Costs of investigations, risk assessment, and planning mitigation measures to address the contamination by hazardous substances, including but not limited to PFAS and other toxic chemicals;

d. Costs of treatment for hazardous substances, including but not limited to PFAS and other toxic chemicals, including design, installation and operation of remediation systems to remove PFAS to a safe level of non-detect;

e. Loss of water production capacity;

f. Diminished consumer confidence in Pepperell's drinking water;

g. Potential cost to design and install replacement water sources;

h. Attorney fees and costs; *and*

i. Other compensatory damages.

266. As a direct result of the foregoing, Pepperell seeks compensatory damages in a sum to be determined by a jury at the time of trial.

## **PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing claims, Plaintiff TOWN OF PEPPERELL requests that the Court grants the following relief:[17]

---

[17] Plaintiff expressly disclaims recovery for PFAS contamination from aqueous film-forming foam (AFFF).

A. Find the Defendants liable, jointly and severally, for necessary response costs as the owners or operators of a facility from which there has been and is a release of hazardous substances, including PFOA and PFOS, that have contaminated Pepperell's public drinking water supply, and order Defendants to reimburse the Pepperell for its past, present, and future costs to investigate, monitor, evaluate, and remediate the PFAS that continues to migrate into Pepperell's public water supply, including the costs of employing outside consultants and testing labs for these tasks.

B. Issue a declaratory judgment on liability and damages under 42 U.S.C. § 9607(a) for costs to remove and/or remediate the hazardous substances and PFAS, including PFOA and PFOS, contamination in the Town of Pepperell's public drinking water supply.

C. Award Pepperell monetary damages for the continuing trespass, continuing public nuisance, negligence, and failure to warn caused by the PFAS contamination of the Pepperell's public water supply.

D. Order Defendants to pay for or agree to reimburse the cost of a treatment system(s) to be installed by Pepperell to remove PFAS from the public water supply.

E. Award Pepperell its reasonable attorney fees and legal expenses incurred in evaluating the PFAS contamination and prosecuting these claims.

F. Award Pepperell such other relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff TOWN OF PEPPERELL demands a trial by jury on all claims for which a jury trial is available.

Dated: February 24, 2026

Respectfully submitted,

*/s/ Harold P. Naughton, Jr.*
Harold P. Naughton, Jr., Esq., Judge (ret.)
**NAPOLI SHKOLNIK PLLC**
PO Box 128
Clinton, MA 01510-0128
Tel. (212) 397-1000
HNaughton@napolilaw.com

James L. Simpson, Esq.
*(Pro Hac Vice Forthcoming)*
**NAPOLI SHKOLNIK PLLC**
360 Lexington Avenue, Floor 11
New York, NY 10017-6502
Tel. (212) 397-1000
JSimpson@napolilaw.com
ACroner@napolilaw.com

Paul J. Napoli, Esq.
*(Pro Hac Vice Forthcoming)*
Marisa C. Font-Robert, Esq.
*(Admission Application Forthcoming)*
**NS PR LAW SERVICES LLC**
1302 Avenida Ponce de León
San Juan PR 00907-3982
Tel. (833) 271-4502
PNapoli@nsprlaw.com
MFont@nsprlaw.com

***Counsel for Plaintiff***